[Cite as *State v. Crawford*, 2020-Ohio-2939.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 108431 |
| v. | : | |
| JEREMY CRAWFORD, | : | |
| Defendant-Appellant. | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 14, 2020

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-634633-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kristin M. Karkutt and Brian Lynch, Assistant Prosecuting Attorneys, *for appellee.*

Brian R. McGraw, *for appellant.*

RAYMOND C. HEADEN, J.:

{¶ 1} Defendant-appellant Jeremy Crawford ("Crawford") appeals from his conviction and sentence for discharge of a firearm on or near prohibited premises,

involuntary manslaughter, and having a weapon while under disability. For the reasons that follow, we affirm.

## Procedural and Substantive History

{¶ 2} On November 27, 2018, the Cuyahoga County Grand Jury indicted Crawford on one count of murder in violation of R.C. 2903.02(B), one count of discharge of a firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3), one count of involuntary manslaughter in violation of R.C. 2903.04(A), and one count of having weapons while under disability in violation of R.C. 2923.13(A)(3). With the exception of having weapons while under disability, each count carried one- and three-year firearm specifications. The indictment was the result of an incident that took place in the early morning hours of August 19, 2018.

{¶ 3} A jury trial began on March 7, 2019. At trial, the state called Larissa Yanetta ("Larissa"), who testified that in the afternoon on August 18, 2018, she was doing her niece Cassandra Yanetta's ("Cassandra") hair, and drinking at her house. Around 1 a.m. on August 19, Larissa and Cassandra left the house and went to several bars — Henry's, Victory Lap, Bar CLE, and then back to Henry's. When they went to Henry's the second time, they saw their cousin Gary Dickens ("Dickens"), the victim in this case. When the bar closed around 2:45 a.m., Dickens, Cassandra, and Larissa wanted to go somewhere to continue drinking. Cassandra called Crawford, her ex-boyfriend. In the meantime, the trio decided to go to Cassandra and Larissa's cousin Chris Campbell's ("Campbell") house, which was located at

3436 Storer Avenue in Cleveland. Larissa testified that Campbell and his girlfriend Tiffany Fredericy ("Fredericy") were already at Campbell's house.

{¶ 4} A short time later, Crawford showed up at Campbell's house with a friend, an unidentified black man. Larissa testified that she said something to Crawford that caused him to tell her he was going to slap her. In response to this, Dickens and Campbell both got involved, and this in turn lead to Crawford's friend getting involved in the disagreement. Dickens and Larissa left the house and went outside.

{¶ 5} According to Larissa, Crawford followed them outside, pulled out a gun, and started shooting it in the air. Larissa testified that as she and Dickens got into the car, she heard four thumps. Dickens slumped over the gear shift in the car and Larissa pushed him off, thinking that he was joking. Moments later, Dickens realized that he had been shot, and Larissa drove directly to MetroHealth Medical Center ("MetroHealth"). Larissa testified that she did not see anyone other than Crawford brandish a gun that night.

{¶ 6} The state also called Cassandra as a witness. Cassandra testified that she dated Crawford for several months in 2018. She also testified that she had been drinking all day and into the evening on August 18 and 19 and was "over her limit" of alcohol consumption. Cassandra did not specifically remember telling Crawford that she was going to Campbell's house with Larissa and Dickens, but she testified that it was a possibility and she had been communicating with him throughout the night. Cassandra testified that when they got to Campbell's house, there was

another man and woman at the house that Cassandra did not know, in addition to Campbell and Fredericy. According to Cassandra, Larissa and Crawford did not like each other, so when Larissa made a comment to Crawford when he showed up at Campbell's house, Cassandra tried to separate them and pull Crawford outside. Cassandra testified that as the argument continued, everyone in the house came outside. At one point, Cassandra recalls hearing Dickens tell Crawford that he was going to "beat" him "like he did before," and that this comment escalated the situation further.

{¶ 7} Cassandra testified that she saw Crawford fire a gun into the air when he was standing in the middle of the street, and she heard one shot. She further testified that she was in shock after hearing the first gunshot, and as she was trying to deescalate the situation, she was holding Larissa when she heard Dickens say that he got shot. According to Cassandra, she saw Crawford's friend standing near Crawford's car and did not see that he had a gun. Larissa and Dickens sped off before Cassandra could get into the backseat of the car. Cassandra testified that Crawford and his friend also drove away immediately. Cassandra also testified that she heard two gunshots that seemed to have come from Crawford's car as it was speeding away. She tried to call Crawford several times but could not reach him. Cassandra did not call 911, and she was unsure if anyone else at the house might have called 911 to report that Dickens had been shot.

{¶ 8} The police eventually arrived at Campbell's house. Cassandra testified that when she was initially interviewed by police after the incident, she lied

and told them she had been asleep because she was nervous. During a subsequent meeting with detectives, she relayed to them what she witnessed as captured in aforementioned testimony.

{¶ 9} The state called Detective Walter Emerick ("Detective Emerick") as a witness. Detective Emerick testified that he responded to the scene shortly after 6 a.m. on August 19. He described the process he used to collect physical evidence — a shell casing — from the scene and take photographs of the street and interior and exterior of the house.

{¶ 10} The state also called Campbell and Fredericy as witnesses. Campbell explained that Larissa and Cassandra are his paternal cousins, and that Dickens was his uncle's sister's son who he was not related to but grew up with, and that Crawford is his maternal cousin. Campbell testified that his cousin Nancy and his friend and then-roommate Thomas Banig ("Banig") were both at his house on August 18. Campbell testified that he, Fredericy, Nancy, and Banig were drinking, had done cocaine and ecstasy, and were listening to music at his house when Dickens, Cassandra, and Larissa arrived.

{¶ 11} A short time later, they heard a knock at the front door because Crawford and his friend had arrived. According to Campbell, as soon as Crawford came inside the house, he started arguing with Larissa. Campbell testified that when Crawford and Larissa had been arguing for a few minutes, Crawford's friend lifted up his shirt to show everyone that he had a gun. In response, Campbell told

Crawford that he and his friend needed to leave, and everyone began to leave the house and go outside.

{¶ 12} Campbell testified that the argument continued outside, and he tried to calm everyone down. According to Campbell, he went inside at one point and heard gunshots, so he decided to call Crawford's brother to see if he could calm down Crawford. He brought the phone to Crawford, and Crawford put his gun away but would not take the phone and talk to his brother. Campbell testified that he did not see who fired the gunshots he heard. Campbell went inside, and a short time later the police arrived and asked him what happened. The police ultimately arrested Campbell.

{¶ 13} Fredericy testified that she observed Crawford fire his gun several times, and subsequently observed the unidentified man shoot Dickens. According to Fredericy, Crawford was standing near his car, and the unidentified man fled the scene on foot.

{¶ 14} Cleveland Police Officer Ryan Sowders ("Officer Sowders") testified that he responded to a call of shots fired in the area around Campbell's house. Officer Sowders toured the area for approximately ten minutes but was unable to locate the source of the call. Officer Sowders testified that several minutes later, he received a call from MetroHealth police that someone at the front of the hospital had been shot. Officer Sowders and his partner responded to MetroHealth, where MetroHealth police had detained Larissa. Officer Sowders spoke to Larissa, learned where the shooting had taken place, and relayed that information to dispatch.

{¶ 15} Cleveland Police Officer Ryan Miranda ("Officer Miranda") testified that he responded to Campbell's house to investigate. Officer Miranda testified that the lights were off at Campbell's house and it took several knocks before someone came to the door. Officer Miranda ultimately communicated with Campbell, Fredericy, Banig, Nancy, and Cassandra, and attempted to make sure there were no weapons inside the home and search the area surrounding the house for evidence that a shooting had taken place.

{¶ 16} Dr. David Dolinak ("Dr. Dolinak"), a deputy medical examiner, testified that he performed an autopsy on Dickens. Dr. Dolinak testified that Dickens suffered two gunshot wounds in the right hip area. According to Dr. Dolinak, one of the bullets traveled right to left through Dickens's pelvis and lower abdomen, and the second traveled a similar path across his body but several inches lower. Dickens also had a small laceration on his forehead. As a result of his injuries, Dickens had an emergency surgery, but he suffered significant blood loss. Dr. Dolinak testified that Dickens ultimately died as a result of his gunshot wounds and that his manner of death was homicide.

{¶ 17} Homicide Detective Raymond Diaz ("Detective Diaz") testified that he responded to Campbell's house on the morning of August 19, 2018. Detective Diaz collected six spent 9 mm handgun shell casings that were found in the street outside Campbell's house. He testified that Campbell was not cooperative, but he spoke with Cassandra, who consented to a search of her cell phone.

{¶ 18} Homicide Detective Kathleen Carlin ("Detective Carlin") testified that she responded to MetroHealth on August 19, 2018. Detective Carlin interviewed Larissa and subsequently obtained buccal swabs from Larissa for comparison, and elimination to any DNA evidence that might have been collected at the scene. Detective Carlin also reviewed other evidence in this case and eventually identified Crawford as a suspect. An arrest warrant for Crawford was issued.

{¶ 19} Detective Carlin identified a second suspect, the unidentified man who arrived at Campbell's house with Crawford. According to Detective Carlin, she learned of a nickname for this man that ultimately led to Anthony Barnes ("Barnes").

{¶ 20} Edward Lattyak ("Lattyak"), the firearms-section supervisor at the Cuyahoga County Medical Examiner's Office, testified as a ballistics expert. Lattyak testified that he performed both a visual physical examination and a microscopic examination of the shell casings and determined that they came from two separate firearms. Four of the six casings were discharged from one firearm, and the other two were discharged from a second gun. Daniel Mabel ("Mabel"), a trace-evidence forensic scientist, testified that as a result of the trace evidence he examined in this case, Dickens was likely shot from a distance of approximately four feet.

{¶ 21} The state also called Angela Manns ("Manns"), the girlfriend of Crawford's half-brother. Manns testified that on one occasion, several days after the shooting, Crawford told her that he shot Dickens at a party after the two men had gotten into an argument. Manns also testified that the next day, Crawford told her

that he had only shot in the air and the unidentified man with him at the party had actually shot Dickens.

{¶ 22} Following the state's case, Crawford made a Crim.R. 29 motion. The court denied this motion. Crawford then testified on his own behalf. Crawford identified the man he was with at the time of the shooting as "Prince" and testified that they had known each other for approximately two months before the shooting. According to Crawford, he called Prince on the night of August 18, 2018, because he needed help picking up snowblowers and loading them into his car. Later that night, Crawford and Prince went to meet Cassandra at Campbell's house. Similar to the description in other witnesses' testimony, as soon as they arrived at Campbell's house, Crawford and Larissa got into an argument. Crawford testified that as the argument escalated, everyone but Nancy and Banig went outside. Crawford described grabbing his gun from his car and firing two shots in the air in an attempt to diffuse the situation. According to Crawford, he was ready to leave and standing near his car when Prince went up to Dickens and shot him. Crawford testified that Prince fled on foot and fired two shots back towards the scene. Crawford then fled the scene in his car.

{¶ 23} Crawford renewed his Crim.R. 29 motion, and the court again denied the motion.

{¶ 24} The jury returned a verdict of not guilty on the charge of murder, and guilty on the charges of discharge of a firearm on or near prohibited premises, involuntary manslaughter, and having weapons while under disability.

{¶ 25} On April 1, 2018, the court held a sentencing hearing. The court heard from the prosecutor, the victim's fiancée, the victim's brother, the victim's mother, defense counsel, Crawford's father and brother, and Crawford. The court stated that it had reviewed the presentence investigation report and considered the remarks made at sentencing. The court also stated that Crawford minimized his participation in the incident and failed to cooperate with authorities in locating the unidentified man Crawford brought to Campbell's house. The court proceeded to sentence Crawford to 180 days on discharge of a firearm on or near prohibited premises; seven years on involuntary manslaughter, and three years on the corresponding firearm specification, to be served consecutively; and three years on having while weapons under disability, for an aggregate sentence of ten years.

{¶ 26} Following a brief recess, prior to the journalization of the sentence, the court reconvened and proceeded to resentence Crawford to 180 days on discharge of a firearm on or near prohibited premises; ten years on involuntary manslaughter and three years on the corresponding firearm specification, to be served consecutively; and three years on having weapons while under disability, for an aggregate sentence of 13 years. The court stated on the record that because of Crawford's unwillingness and inability to provide information as to the identity of the man he claimed was the shooter, together with his claims of remorse, it was increasing his sentence for involuntary manslaughter from seven to ten years.

{¶ 27} Crawford appeals, presenting two assignments of error for our review.

## Law and Analysis

**{¶ 28}** In his first assignment of error, Crawford argues that the crime of having a weapon while under disability cannot, as a matter of law, be the underlying proximate cause of a death. Therefore, according to Crawford, his involuntary manslaughter conviction was not supported by sufficient evidence.

**{¶ 29}** R.C. 2903.04 provides that a person commits involuntary manslaughter by "[causing] the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony." In this case, the predicate felony offense for involuntary manslaughter was having weapons while under disability. Pursuant to R.C. 2923.13(A)(3), a person commits this offense when they "knowingly acquire, have, carry, or use any firearm or dangerous ordnance," and they were under indictment for or have been convicted of a felony-drug offense.

**{¶ 30}** Crawford argues that because having weapons while under disability is generally a crime of possessing, and not shooting, a firearm, and the mere possession of a firearm does not cause injury, this offense cannot have been the proximate cause of Dickens's death. Therefore, according to Crawford, his conviction for involuntary manslaughter was supported by insufficient evidence.

**{¶ 31}** The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier

of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Thompkins*, 78 Ohio St.3d 386, 678 N.E.2d 541 (1997).

{¶ 32} The term "proximate result" used in R.C. 2903.04 mandates that a person will be criminally responsible for causing the death of another only where the consequences of his conduct are direct, normal, and reasonably inevitable when viewed in the light of ordinary experience. *State v. Sabatine*, 64 Ohio App.3d 556, 560, 582 N.E.2d 34 (8th Dist.1989), citing *State v. Losey*, 23 Ohio App.3d 93, 95, 491 N.E.2d 379 (10th Dist.1985), and *State v. Chambers*, 53 Ohio App.2d 266, 272, 373 N.E.2d 393 (9th Dist.1977). In *Sabatine*, this court upheld an involuntary manslaughter conviction where the proximate result of the victim's death was illegal possession of a firearm in a liquor premise, in violation of R.C. 2923.121. R.C. 2923.121 makes it a crime to possess a firearm in a liquor permit establishment.

{¶ 33} In *Sabatine*, the defendant not only brought a loaded firearm into a bar, she pointed and discharged the weapon from inside the restroom. The bullet went through the restroom door and into a crowded bar area, where it struck the victim in the forehead. This court held that R.C. 2923.121 was clearly designed to prevent shootings in liquor establishments, and therefore, the defendant's reckless handling of her firearm was within the purview of that statute and was the proximate result of the victim's death.

{¶ 34} Similarly, in *State v. Brisco*, a jury found Brisco guilty of involuntary manslaughter by finding that his possessing a weapon while under disability was the proximate cause of the victim's death. *State v. Brisco*, 10th Dist. Franklin No. 16AP-

759, 2017-Ohio-8089, ¶ 24. The court in that case found that "but for [Brisco] having a gun, the death would not have occurred," and furthermore that Brisco's "having a gun and the gun being present when he and [the victim] were disagreeing was a cause of her death." *Id.* at ¶ 25.

{¶ 35} Crawford attempts to distinguish his case from *Sabatine* and *Brisco* by correctly pointing out that in both of those cases, there was no dispute that the defendant fired a gunshot that killed the victim. According to Crawford, use of a having weapons while under disability charge as the proximate cause of involuntary manslaughter requires an additional finding that Crawford fired the gun, and there is no such finding reflected in this verdict. We disagree.

{¶ 36} Crawford cites no legal authority for his assertion that an additional finding that Crawford fired the gun was required to support his conviction. In fact, the holdings in both *Sabatine* and *Brisco* are at odds with this assertion. In *Sabatine*, 64 Ohio App.3d 556, 582 N.E.2d 34, the predicate offense involved exclusively the possession of a firearm. Similarly, in *Brisco*, the court found that Brisco's possession of a gun, on its own, was a cause of the victim's death. Further, although there was not an explicit finding in the verdict that Crawford fired his gun, there is ample evidence in the record — including Crawford's own testimony — that he fired his gun.

{¶ 37} Similarly, Crawford argues that there is no evidence showing which of the four elements — acquire, have, carry, or use — the jury was relying on in reaching a guilty verdict for having weapons while under disability. According to

Crawford, only the "use" element would be sufficient for having weapons while under disability to be the proximate cause of death. We agree with Crawford that it is not clear from the verdict which of the four elements the jury relied upon in the conviction of Crawford. We disagree that this somehow leads to a conclusion that his involuntary manslaughter conviction was supported by insufficient evidence.

{¶ 38} Crim.R. 31(A) provides that a criminal defendant is entitled to a unanimous verdict. This rule applies in alternative means cases, or cases in which a single offense may be committed in more than one way. *State v. McKinney*, 8th Dist. Cuyahoga No. 106377, 2019-Ohio-1118, ¶ 33. Unanimity is not required as to the means by which the crime was committed so long as substantial evidence supports each alternative means. *Id.*, citing *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, ¶ 49.

{¶ 39} Here, there is substantial evidence supporting each alternate element of having weapons while under disability. R.C. 2923.13(A)(3) makes it a crime for an individual to knowingly acquire, have, carry, or use any firearm or dangerous ordnance if the individual is under indictment for or has been convicted of a felony drug offense. Here, there is undoubtedly substantial evidence that Crawford acquired, had, and carried a firearm, and he does not appear to dispute this. There is also substantial evidence that Crawford used the firearm. Multiple eyewitnesses testified that Crawford brought a weapon to Campbell's house, brandished the gun, and fired the gun. Crawford himself testified that he fired his gun, although he denies firing his gun at Dickens.

**{¶ 40}** Although Crawford argues that a conviction that may have been based on his acquiring, having, or carrying a firearm could not have been a proximate cause for purposes of his involuntary manslaughter conviction, he again provides no authority for this argument. Crawford repeatedly points to the uncertainty in the facts of this case, especially as compared to cases such as *Sabatine*, 64 Ohio App.3d 556, 582 N.E.2d 34, and *Brisco*, 10th Dist. Franklin No. 16AP-759, 2017-Ohio-8089. We acknowledge that the testimony and other evidence in this case do not make it definitively clear who shot and killed Dickens, as evidenced by the not guilty verdict on the murder charge. There was, however, evidence in the record that Crawford acquired, had, carried, and used a firearm. Further, there was evidence in the record that he instigated a disagreement, threatened physical violence, escalated this disagreement, brandished a firearm, and shot a firearm. Viewing this evidence in the light most favorable to the state, we find that there was sufficient evidence that Dickens's death was the proximate result of Crawford having a weapon while under disability. Therefore, Crawford's first assignment of error is overruled.

**{¶ 41}** In his second assignment of error, Crawford argues that the court abused its discretion and abused the sentencing process by returning him to the courtroom and increasing his sentence without legal basis. We disagree.

**{¶ 42}** As an initial matter, we do not review felony sentences for abuse of discretion. *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 7; R.C. 2953.08(G)(2). When reviewing felony sentences, an appellate court may increase, reduce, modify, or vacate a sentence only if it clearly and convincingly finds

that either the record does not support the trial court's statutory findings or that the sentence was contrary to law. *Id.* at ¶ 9; R.C. 2953.08(G)(2). A sentence is contrary to law if the court fails to consider the purposes and principles of felony sentencing set forth in R.C. 2929.11 and the sentencing factors set forth in R.C. 2929.12.

{¶ 43} Crawford acknowledges that because his sentence had not been journalized, there is no legal problem with the timing of the court's decision to hold a brief recess and then reconvene to impose a reconsidered sentence. Until a sentence has been journalized, the sentencing court may modify an orally pronounced sentence. *State v. Wright*, 8th Dist. Cuyahoga No. 107213, 2019-Ohio-1361, ¶ 16. Rather, Crawford argues that the court was not provided any new information, and the record does not reflect the court's reasons for increasing his sentence.

{¶ 44} Our review of the record reveals that not only did the court comply with R.C. 2929.11 and 2929.12, it also made clear its reasons for increasing the sentence. R.C. 2929.11(A) establishes that the overriding purposes of felony sentencing are to protect the public from future crime by the offender, to punish the offender, and to promote the effective rehabilitation of the offender using the minimum sanctions that the court determines will accomplish those purposes. While sentencing courts have discretion to determine how best to comply with these purposes, R.C. 2929.12 provides a list of factors that courts must consider in felony sentencing. Courts must carefully consider these purposes and factors, but "it is not necessary for the trial court to articulate its consideration of each individual factor

as long as it is evident from the record that the principles of sentencing were considered." *State v. Gonzalez*, 8th Dist. Cuyahoga No. 102579, 2015-Ohio-4765, ¶ 6, citing *State v. Roberts*, 8th Dist. Cuyahoga No. 89236, 2008-Ohio-1942, ¶ 10.

{¶ 45} Here, the court stated that it considered all required factors of the law and found that prison was consistent with the purpose of R.C. 2929.11. Further, the court stated on the record that it considered Crawford's lack of remorse, failure to cooperate with police, and consistent minimizing of his own responsibility. Crawford's sentence was not contrary to law, and the court was within its discretion in imposing a sentence following a brief recess. Crawford's second assignment of error is overruled.

{¶ 46} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
RAYMOND C. HEADEN, JUDGE

SEAN C. GALLAGHER, P.J., and
FRANK D. CELEBREZZE, JR., J., CONCUR